IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| TAYLOR S.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:21-cv-00002 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Taylor S. asks this Court to review the Commissioner of Social Security's final

decision denying his application for disability insurance benefits ("DIB") under Title II of the

Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under

28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and

the applicable law, I cannot find that substantial evidence supports the Commissioner's denial of

benefits.[2] Accordingly, I respectfully recommend that the presiding District Judge reverse the

decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] I decline Taylor's request for oral argument, ECF No. 16, because the facts and legal positions are
adequately presented in the materials before the court and a hearing would not aid the decisional process.
*See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2). The Commissioner did not request oral argument.

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100

(1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes

into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in

"any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20

C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

Taylor applied for DIB in February 2019, *see* Administrative Record ("R.") 207–08,

alleging disability because of type I diabetes, gastroparesis, diabetic neuropathy, attention deficit

disorder ("ADD"), attention deficit/hyperactivity disorder ("ADHD"), hypothyroidism, and

depression, R. 219. He alleged that he became disabled on July 15, 2018. R. 207. He was twenty-

six years old, or a "younger person" under the regulations, on his alleged onset date. R. 103; 20

C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied his

claim initially in May 2019, R. 103–15, and upon reconsideration that August, R. 117–29. In

June 2020, Taylor appeared with counsel and testified at an administrative hearing before ALJ

Brian Rippel. *See* R. 71–102. A vocational expert ("VE") also testified at this hearing. *See* R.

93–102.

ALJ Rippel issued an unfavorable decision on June 29, 2020. *See* R. 10–25. He found

that Taylor briefly worked as a shift supervisor after July 15, 2018, but "he received

accommodations 'in multiple ways,' including reduced hours and days, and change of shifts,

[and] he 'still had to call out the majority of [days] because of blood sugar and gastroparesis

issues,'" R. 12 (quoting R. 81), before he stopped working. Thus, this work did not qualify as

3

"substantial gainful activity." *Id.* Taylor had "severe" impairments of asthma, gastroparesis, diabetes mellitus, diabetic neuropathy, depression, anxiety disorder (including generalized anxiety disorder), panic attacks, and ADHD. R. 13. Taylor's remaining medical conditions, including gastroesophageal reflux disease and hypothyroidism, were either "non-severe," or were not medically determinable impairments. *Id.* None of Taylor's "severe" impairments met a relevant Listing. R. 13–17 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 3.03, 5.00, 11.14, 12,04, 12.06, 12.11). As part of that determination, ALJ Rippel found that Taylor had "moderate limitation[s]" with "learning, remembering, and applying information" and "adapting and managing oneself," and "mild limitation" with "concentrating, persisting or maintaining pace." R. 15–16; *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(B), 12.06(B). All three ratings relied entirely on Taylor's description of how his "uncontrollable" blood sugars and gastroparesis symptoms, including chronic fatigue and "frequent diarrhea," impacted his overall functioning in those areas. R. 15–16 (citing R. 81–93, 231–38, 275–82).

ALJ Rippel then evaluated Taylor's RFC and determined he could perform "light"[4] work with additional limitations. R. 17. Taylor could frequently balance; occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; could tolerate occasional exposure to heat extremes, vibration, respiratory irritants, and/or workplace hazards; was limited to simple, routine tasks in entry-level unskilled work with short and simple instructions; and was limited to low-stress work, "defined as involving only occasional independent decision making and/or changes in the work setting[]." *Id.*; *see* R. 15–16. Based on

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); R. 17.

this RFC finding and the VE's testimony, ALJ Rippel found that Taylor could not perform any of his past relevant work, R. 23, but that he could perform the requirements of certain "light, unskilled" jobs existing in significant numbers in the national economy, *id.*, including cleaner, office helper, and mailroom clerk, R. 24 (citing R. 94–101). He therefore found Taylor was "not disabled" from July 15, 2018, through June 29, 2020. R. 24–25. The Appeals Council declined to review that decision, R. 1–6, and this appeal followed.

## III. Discussion

Taylor raises three arguments challenging the ALJ's decision. *See generally* Pl.'s Br. 10–28, ECF No. 16-1. He first asserts that the ALJ erred "in discrediting the opinions of treating nephrologist Dr. Overby," who identified specific limitations indicating that Taylor "was unable to sustain full-time competitive employment" because of symptoms related to "erratic" blood glucose levels and chronic gastroparesis, as well as the need to repeatedly test and manage his glucose levels during the day. *Id.* at 10–14; *see also* R. 16–17. Next, he generally contends that the ALJ's RFC finding is not supported by substantial evidence because it conflicts to some extent with every medical opinion in the record, and the ALJ did not explain how he chose the limitations related to Taylor's severe mental impairments. *See id.* at 14–21. Lastly, Taylor argues that ALJ Rippel erred in his evaluation of Taylor's report of limitations and symptoms, especially as they relate to his severe diabetes and gastroparesis and the need to manage those symptoms throughout the day. *Id.* at 21–28. Taylor's first and last arguments are persuasive.

A.    *Summary*

1.    *Relevant Evidence*

Taylor was diagnosed with insulin-dependent Type I diabetes mellitus when he was twelve years old. R. 321. As a teenager, he needed to "give himself insulin four times daily,

check and monitor blood sugar levels, and eat if necessary to ensure [target] levels" and prevent diabetic ketoacidosis. *Id.* "The process can't be rushed," and Taylor "need[ed] to have leeway in this process" during the school day. *Id.* In 2009–2010, he was found "eligible to receive 504 services/accommodations due to medically diagnosed diabetes and substantially limited learning and concentration skills." R. 318; *see* R. 330 ("Diabetes, especially when not controlled, may limit his ability to learn efficiently and concentrate effectively."). Under his 504 Plan, Taylor had the flexibility to "arrive late or leave class early to check his blood sugar levels or go to lunch" and to "leave class to use the restroom, get water, or obtain a snack." R. 348. "If he experience[d] low blood sugar" in the classroom, then "he may need additional time to complete classwork, assignments, and tests." *Id.* Taylor completed one year of college in 2013. R. 220.

In late July 2018, Taylor presented to the emergency department ("ED") at Sentara RMH Medical Center for a "diabetic emergency." R. 495. Taylor reported that he began vomiting the night prior. *Id.* He said he thought his blood sugar was high, so he took four units of Humalog in addition to his nightly dosage of sixteen units of Lantus. *Id.* Taylor looked "very uncomfortable" and was "very diaphoretic" and vomiting when he arrived. R. 497.

Labs revealed Taylor was "not in diabetic ketoacidosis." R. 496. After intravenous fluids, Taylor "appear[ed] much better and fel[t] much better," and he was in "stable nontoxic-appearing condition." *Id.* A few days later, in August, Taylor saw Anthony Iudica, M.D., for possible gastroparesis. R. 458. He had been "having issues for several months," which were "slowly getting worse." *Id.* Taylor reported occasional vomiting of undigested food and that his blood sugar was "vol[a]tile." *Id.* His physical examination was unremarkable. *Id.* Dr. Iudica assessed non-intractable vomiting with nausea. R. 460. A gastric emptying study performed later that month revealed normal results. R. 529.

6

In late August, Taylor saw Terry Overby, M.D., for concerns about his poorly controlled diabetes. R. 575 ("[P]resents with great concern over his poor control. . . . He has been running much higher glucoses and desperately would like to improve that."); *see, e.g.*, R. 1272, 1274. Taylor reported that he could no longer work at his job at Sheetz because he felt "hot natured," and it was "actually too hot for him to work." R. 575. Dr. Overby noted that Taylor's glucose levels had been "running much higher," and Taylor reported frequent nausea and vomiting undigested food. *Id.* He tended to feel "much better" in the mornings, but he "state[d] that he frequently [got] diarrhea and he often ha[d] palpations." *Id.* Exam findings were unremarkable. *Id.* Dr. Overby assessed type I diabetes mellitus, moderate albuminuria, hypothyroidism, ADHD, asthma, intermittent nausea and diarrhea, and heat intolerance and palpations. R. 576. Dr. Overby thought Taylor "would be an excellent candidate for continuous glucose monitoring and in particular a 670G insulin infusion pump with monitor," which was "the last step in technology currently available." *Id.* Dr. Overby told Taylor he needed to "record his glucose levels four times daily for at least a month and bring them in," *id.*, and he prescribed metoclopramide for Taylor's nausea, *id.*

Taylor saw Dr. Overby again on October 10 for "continued extreme variability" in his glucose control "even though he may check his glucoses 10 to 12 times daily." R. 577; *see* R. 1272 ("He is checking his glucoses 6 to 8 times daily and yet, he has had some hypoglycemia.") (Mar. 2018); R. 585–86 (8.6 A1c). Taylor also complained of "minor hypoglycemia," but "significant hyperglycemia" and ongoing "difficulty with significant intermittent nausea and vomiting." R. 577 ("He complained about these symptoms at his last appointment and now finds himself restricted to only certain types of foods that he can eat."). Dr. Overby expressed concern that Taylor may suffer from gastroparesis and noted that the metoclopramide that he prescribed

at Taylor's last visit had "only been of modest benefit." Taylor felt "extremely depressed," was "tearful in the office," had difficulty sleeping, felt "hopeless about his current situation and his life," and reported frequent panic attacks. *Id.* Exam findings were normal, and his A1c level was 8.6. R. 578. Dr. Overby assessed type I diabetes mellitus, moderate albuminuria, hypothyroidism, ADHD, asthma, intermittent nausea and diarrhea, heat intolerance and palpations, intermittent nausea with possible diabetic gastroparesis, and depression, anxiety, and panic attacks. *Id.* He noted Taylor was "agitated and depressed," questioning "whether the metoclopramide may be incriminated," but noted that some of those symptoms started before Taylor began taking it. *Id.* He switched metoclopramide to erythromycin, started Taylor on paroxetine, and referred him immediately to the Behavioral Health department. *Id.*

When Taylor presented to Dr. Overby again on October 31, he reported his nausea, anxiety, and depression had all improved, and exam findings were unremarkable. R. 579. It was noted that his "glucoses continue to be quite variable" and at his last visit "his random glucose was 282 with a C-peptide of less than 0.1, and thus he does qualify for continuous glucose monitoring." *Id.* Dr. Overby's prior assessment of intermittent nausea with possible diabetic gastroparesis was changed to "intermittent nausea with negative gastric emptying study, August 14, 2018." R. 580; *see also* R. 670 ("Normal gastric emptying study. No evidence of gastroparesis.") (Aug. 14, 2018). It was noted that Taylor had not picked up the paroxetine or erythromycin prescribed at his last visit, R. 579, and that he had missed a psychiatry appointment, but was to reschedule it, R. 580.

In December, Taylor saw Dr. Overby for complaints of diabetes, diabetic gastroparesis, and anxiety disorder. R. 581. He was "much less anxious," and was scheduled to see a therapist in January 2019. *Id.* Dr. Overby noted that Taylor had only experienced one or two episodes of

8

morning nausea since his last visit and that Taylor thought his glucose was doing "much better." *Id.* He was still experiencing hot spells, but his diarrhea had decreased, and he felt "generally better" overall. *Id.* Exam findings were normal. R. 582. Dr. Overby's assessment again included intermittent nausea with possible diabetic gastroparesis. *Id.* Dr. Overby noted Taylor appeared to be doing "much better," his depression and anxiety were "much improved," and his panic attacks were "better." *Id.*

Taylor presented to Delaney Snyder, PA, of Sentara Valley Behavioral Health in January 2019 for his anxiety. R. 501. Taylor expressed worry about his stress levels and glucose readings and attributed his anxiety primarily to his diabetes and recent gastroparesis diagnosis. *Id.* He reported difficulty sleeping, panic attacks every couple of months, and feeling hopeless. *Id.* He also said that he "has not been able to finish college" and recently quit his job "due to gastroparesis and inability to adequately manage blood sugars at work." R. 501–02 ("Pt has completed 1.5 years of college at Liberty University but took a hiatus in 2013 because he was missing too many classes due to his DM."). He wanted to get a bachelor's degree and teach English online, expressing that he felt he "could manage it with his medical problems." R. 502; *see also* R. 462 ("He is getting his BS in hopes to do online teaching.") (Jan. 8, 2019). On exam, Taylor displayed anxious mood, congruent affect, and fair insight and judgment. *Id.* PA Snyder assessed generalized anxiety disorder, increased his Paxil, continued him on Adderall, and recommended deep breathing techniques. R. 503–04. Taylor followed up with PA Snyder in February, reporting his anxiety was "at least 50% better since Paxil dose increase," and that his anxiety "less frequently buil[t] to the point of panic." R. 511. But he "still ha[d] a tendency to get ahead of himself" by "spending time researching and worrying about complications of DM." *Id.* He "continue[d] to struggle with gastroparesis, which ha[d] made it more difficult to keep his

sugars under control," and he was in the process of getting an insulin pump. *Id.* Exam findings were within normal limits, except for a "slightly anxious" mood and "fair" insight and judgment. R. 512. PA Snyder assessed generalized anxiety disorder, weight gain due to medication, and anxiety not adequately controlled. R. 512–13.

Taylor saw Dr. Overby again in April for "uncontrolled type 1 diabetes complicated by gastroparesis." R. 583. He had "extreme variability" in his glucose readings "despite checking his glucoses 10 to 12 times a day and taking four to eight [insulin] shots." *Id.*; *see* R. 998 (8.1 A1c). Taylor also had "infrequent hypoglycemia" and nocturia, and his anxiety and depression were noted to be "diminished." Exam findings were unremarkable. R. 583. Dr. Overby opined that Taylor was "struggling to control his glucose" levels and "desperately need[ed] to have an insulin pump and continuous glucose monitoring" if Taylor's insurance would cover it. R. 584.

Taylor followed up with PA Snyder in May, reporting continued improvement in his anxiety, although he did still experience some spikes on days that he had "bad blood sugars." R. 652. He expected to get his insulin pump in the next two months, which "will be 'a big weight off'" his mind. *Id.* On exam, he was slightly anxious and had congruent affect, but he had fair insight and judgment. *Id.* He had not yet established care with a therapist, and PA Snyder encouraged him to do so. R. 652–53. In July Taylor's anxiety levels were "lower and more manageable," and he told PA Snyder that insurance had approved him for an insulin pump, which he expected to receive within the next month. R. 650. Exam findings were unchanged. *Id.* PA Snyder assessed generalized anxiety disorder and weight gain from medication, and prescribed metformin "to prevent further weight gain." R. 651.

Taylor again saw Dr. Overby in October for continued "poorly controlled" diabetes "despite multiple injections of insulin daily and multiple glucose checks up to eight times daily."

R. 990. He primarily struggled with hyperglycemic reactions. Dr. Overby noted that he generally

did not have "significant" hypoglycemic reactions, "although he did become hypoglycemic in

our office today." *Id.* His glucose levels were "extremely variable, often as high as 300," he

struggled with controlling his glucose, and "the difficulty [was] compounded by his

gastroparesis." *Id.* Taylor had some nausea at least once every couple of weeks, but no vomiting;

he still had "intermittent diarrhea one to two times a day"; his palpations and anxiety had

"diminished significantly" overall; and he was no longer having panic attacks. *Id.* Dr. Overby

noted Taylor was still "keenly interested in beginning continuous subcutaneous insulin infusion

with automated continuous glucose monitoring," and that his office would "arrange for this as

quickly as possible." *Id.* He also told Taylor to stop taking the metformin that PA Snyder

prescribed "primarily to suppress his appetite" because that result "could be counterproductive in

a type 1 diabetic and [was] of no value whatsoever in controlling his glucose." *Id.*

In November, Taylor reported to PA Snyder that he was still waiting on his insulin pump,

he had gotten a new puppy the night before, was "tired but excited" that day, and felt the insulin

pump and his new puppy would "really help" his anxiety. R. 712. On examination, his mood was

noted to be "[h]appy about new puppy," and he had congruent affect, and fair insight and

judgment. R. 713. PA Snyder again assessed generalized anxiety disorder and weight gain from

medication. *Id.*

In January 2020, Taylor again presented to Dr. Overby for his poorly controlled diabetes.

R. 992. Taylor reported that "he ha[d] only had one episode of hypoglycemia severe enough to

require Glucagon since his last visit," his nausea was under "reasonably good control," and he

had gained "a considerable amount of weight" since December 2018. *Id.* Taylor had received his

insulin pump but had not yet started using it because he was waiting for an accessory T-Slim

11

pump. Dr. Overby's assessment was unchanged, and he encouraged Taylor to begin using his regular insulin pump. *Id.*

Later in January, Dr. Overby completed a Diabetes Mellitus Medical Source Statement about Taylor's functional capabilities. R. 1294–98. He opined that Taylor's type I diabetes and diabetic gastroparesis were expected to last at least twelve months and that Taylor's depression and anxiety contributed to his functional limits. R. 1294. Taylor's symptoms included fatigue, episodic blurred vision, excessive thirst and frequent urination, sensitivity to heat, hot flashes and sweating, general malaise, "insulin shock/coma," nausea and vomiting, diarrhea, and difficulty concentrating. He estimated that Taylor would be "unable to function" in a competitive work situation as a result of his diabetes, anxiety, and depression. *Id.* Dr. Overby also opined that Taylor could walk two city blocks without needing to rest or experiencing severe pain, could sit for more than two hours before needing to get up, could stand for one hour at a time before needing to sit down or walk around, and could sit for about two hours total, and stand/walk for fewer than two hours total in an eight-hour workday with normal breaks. R. 1295. Taylor did not require a job in which he could shift positions from sitting, standing, or walking "at will," but he did need periods of walking during an eight-hour day. *Id.* Specifically, he needed to walk for about fifteen minutes once every hour. *Id.* Dr. Overby also found that Taylor required unscheduled five-minute breaks every twenty to thirty minutes so he could deal with his frequent diarrhea and check his glucose levels. *Id.* Further, Taylor could occasionally lift/carry twenty pounds, could frequently twist, stoop, crouch/squat, and climb ladders and stairs, and needed to avoid all exposure to extreme heat and high humidity. R. 1296. Dr. Overby also opined that Taylor would be off-task 25% or more of the workday, was incapable of even "low stress" work

because of his "extreme [illegible] glucose levels," would likely have "good days" and "bad days," and would miss more than four days of work per month. R. 1297.

During an appointment in March 2020, Dr. Iudica noted that Taylor "continue[d] to struggle with gastroparesis." R. 975. In May, Dr. Overby completed another Diabetes Mellitus Medical Source Statement. R. 1007–11. He noted Taylor's "erratic diabetic gastroparesis" and "poorly controlled hyperglycemia" despite being "on continuous insulin pump" with "continuous glucose monitoring." R. 1007. He opined that Taylor would be "very unlikely to keep stable working hours secondary to intermittent nausea and vomiting from gastroparesis." *Id.* Dr. Overby found Taylor would be off-task 20% of the workday, was capable of low-stress work considering his "fluctuating" glucose levels, would experience "good days" and "bad days," and would miss more than four days of work per month. R. 1010. He recommended Taylor undergo a functional capacity evaluation ("FCE") to assess any limitations on work-related activities like sitting, standing/walking, lifting/carrying, or working in certain environments. *See* R. 1008–09.

In June, PA Snyder noted that Taylor's insulin pump had "not had the ideal settings downloaded," and that he was "working on programming it and [thought] he should have sugars under better control over the next couple weeks." R. 1304.

    2.    *Taylor's Statements*

Taylor submitted a Function Report to DDS in April 2019. *See* R. 231–38. His blood sugar spikes caused difficulty sleeping. R. 232. He washed dishes, cleaned, and did light vacuuming each about once per week for fifteen to twenty minutes. R. 233. He needed reminders to complete these tasks, however, "due to sleep schedule being altered by gastroparesis," *id.*, and some days he was too fatigued to do any housework, R. 234. He went outside about two to three times a week, but he was limited in how often he could do so because of fatigue and his "heat

13

sensitivity due to gastroparesis." *Id.* He could drive a car and was able to go out alone, but he did not do so often because of his fatigue and blood sugar spikes. *Id.* His fluctuating blood sugars caused added stress, and he would sometimes "have to bail on plans if [his] blood sugar [was] uncontrollable." R. 237. Taylor explained that his diabetes and gastroparesis had "created a lot of changes in [his] life," as he had to continuously monitor his blood sugar levels and administer insulin. R. 238. He said his gastroparesis made controlling his blood sugar levels "much more difficult," and contributed to issues with his energy level, concentration, sleep, stress, and task management. *Id.* In August 2019, Taylor's father, Wade, submitted a third-party Function Report to DDS and described generally the same limits as Taylor. *See* R. 260–70.

Taylor also submitted a second Function Report to DDS in August 2019. *See* R. 275–82. He said he took a lot of naps throughout the day and his gastroparesis and the stress from dealing with it kept him "from doing any strenuous activities, because of the high blood sugars." R. 275. His gastroparesis continued to impact his sleep, waking him up four to six times a night, and he had "frequent diarrhea from gastroparesis and erythromycin, which is used to treat" that condition. R. 276. He described that his lack of sleep made it difficult for him to perform household tasks. *Id.* He did not go outside often because his gastroparesis caused him "to overheat and profusely sweat in over 70 degree temperatures," and although he could go out alone for short trips, he would need someone with him for longer trips so that he could properly manage his blood sugar levels. *Id.* He described himself as having become "a hermit who doesn't really leave the house due to lack of energy." R. 280. He could walk "around the house" before needing to take a break, and he said he could not pay attention long when his blood sugar was high. *Id.* He described making increasingly frequent trips to the restroom and experiencing exhaustion, anxiety, and stress. R. 282.

14

In June 2020, Taylor testified at an administrative hearing before ALJ Rippel. *See* R. 77–93. He explained that after he got gastroparesis, controlling his blood sugars became increasingly difficult. R. 82 ("I'm trying to get it back under control and having to catch it every 30 -- or not even 30 minutes, 15, 20 minutes until back under control."). He said it was "not uncommon" for his glucose levels to exceed 300 several times a day. R. 83. Taylor's high blood sugar levels made him "really thirsty," caused blurred vision and chest pain, and left him feeling "completely drained." *Id.* He said he would need to drink up to four glasses of water to help get his glucose under control, and he described predicting when and how much insulin to administer as a "guessing game." *Id.* When asked if he needed to lie down or rest when his blood sugar was high, Taylor responded as follows:

> Oh, lot of time, well, when it's high, yeah, I have to sit down, I can't be on my feet, I'm, I just don't have the energy for that if it's at 300. I'll also, a lot of time, yes, I'll end up having to like sit back and lay down for a few hours too, an hour or two, just because it, it drains you. And I, I can only really go back to sit for an hour or two, and you know, I'll have to keep checking my blood sugar so often.

R. 84. Taylor said his gastroparesis made him unable to eat solid foods because he was either unable to digest them, or if he could digest them, he would have a diarrhea episode, which Taylor said he experienced three to four times daily. *Id.*; *see also* R. 85 ("[S]ometimes you can't really control it so, it's like you have to run to the bathroom"). He said his blood sugar reading that morning was at 315, and he said that his gastroparesis slowed down the digestive process in his stomach, making it difficult to know how much insulin he needed to take. R. 86 ("So sometimes, I'll take a shot because it's high, really high and it's 300, but more food will actually go in and I'll check it later, an hour later, an hour and-a-half later and it's still 300, 350, . . . but I haven't eaten, in, in two, three, four hours."). Taylor's high blood sugar also made concentrating difficult, R. 87, and he had to administer emergency Glucagon injections "at least on[c]e a month

if not more," R. 89, to avoid going into hypoglycemic coma, R. 82–83. Taylor was not using his

insulin pump at that time because he was waiting for "upgraded software" that would give him

better control over how much insulin was released. R. 92 ("Right now I'm in the process of

getting an upgraded software for it, because when I did use it, . . . I actually had to start using

more Glucagon shots because I was having so many low blood sugars."). He noted his doctor

had expressed concern over how much Glucagon he was taking and told him to stop using the

pump until they could get the software fixed. *Id.*

## B.    The ALJ's Decision

ALJ Rippel discussed this evidence throughout his written decision. *See* R. 12, 15–16,

18–22. He found that Taylor's gastroparesis, type I diabetes, anxiety disorder, and depression

were "severe" impairments because they "significantly limit [his] ability to perform basic work

activities," R. 13, which according to the regulations include functions like walking, standing,

lifting, and carrying, following simple instructions, exercising judgment, and dealing with

changes in a routine work setting, 20 C.F.R. § 404.1522(b)(1), (3), (6). ALJ Rippel also found

that Taylor had "moderate limitation[s]" with "learning, remembering, and applying

information" and "adapting and managing oneself," and "mild limitation" with "concentrating,

persisting or maintaining pace." R. 15–16; *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(B),

12.06(B). All three ratings relied entirely on Taylor's description of how his "uncontrollable"

blood sugars and gastroparesis symptoms, including chronic fatigue and "frequent diarrhea,"

impacted his overall functioning in those areas. R. 15–16 (citing R. 81–93, 231–38, 275–82).

In evaluating Taylor's RFC, ALJ Rippel summarized Taylor's subjective statements

regarding his symptoms, R. 18–19, summarized the objective and other evidence, R. 19, and

evaluated the opinion evidence of record, R. 21–23. He found that Taylor's "medically

16

determinable impairments could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" for the reasons explained elsewhere in his decision. R. 19.

First, ALJ Rippel found that Taylor's "treatment ha[d] been routine, conservative, and unremarkable, as no surgery ha[d] been recommended, and he ha[d] been treated primarily with medications, which ha[d] been relatively effective in controlling his symptoms." *Id. But see id.* ("[T]reatment records since his alleged onset date indicate he saw . . . a nephrologist . . . for regular follow-up visits for diabetes with uncontrollable blood sugar levels, and complaints of . . . nausea and vomiting of undigested food with bloating"); R. 22 (finding Taylor's testimony and "other evidence of record . . . reflect[ed] persisting or worsening of some of [his] conditions"). Taylor also "ha[d] not alleged any side effects from the use of medications" including Adderall, Lantus, Metformin, and Novalog. R. 20. *But see* R. 16 ("[F]atigue and medication side effects affect his overall functioning." (citing R. 260–70)). Further, Taylor had not been treated by "an endocrinology, neurology, pain management, gastroenterology, cardiology, pulmonary, or mental health specialist" and had "not required significant emergency room treatment or hospitalizations for his severe impairments." R. 20. "Despite alleging significant functional limitations, repeated physical examinations ha[d] failed to reveal significant ongoing psychological, respiratory, or cardiac signs, or significant neurological deficits or decreased strength or range of motion, as would be expected given the degree of limitation alleged." Radiographic testing "likewise fail[ed] to support the extent of [Taylor's] allegations." *Id.* Moreover, Taylor "ha[d] acted inconsistently for one who [was] asserting he is completely disabled, and he ha[d] made inconsistent statements or statements contradicted by other evidence

in the record," such as expressing a desire to "teach English online" because he thought "he could manage it with his medical problems," *id.* (citing R. 462, 502), and he "described daily activities, which [were] not as limiting as would be expected given the complaints of disabling symptoms and functional limitations," *id.* (citing R. 231–38). Lastly, there was evidence that Taylor had "not been entirely compliant in using prescribed medications, or in following prescribed treatment," namely a two-week period in October 2018 where Taylor did not pick up his new prescription for Erythromycin and one missed counseling appointment in October 2019. R. 21 (citing R. 579, 726). Thus, ALJ Rippel concluded that Taylor was in "reasonably good health, and his relatively benign physical examinations belie[d] [his] allegations of disabling symptoms or functional limitations." *Id.*

ALJ Rippel summarized both of Dr. Overby's Medical Source Statements. R. 21–22. ALJ Rippel found Dr. Overby's opinions were "unpersuasive" for several reasons. First, the opinions were "not consistent with the examinations, which were entirely normal." R. 22. Next, Dr. Overby's opinions "were checkbox forms with minimal responses, and his [second] opinion was incomplete with no physical/postural, manipulative, or environmental restrictions." *Id.*; *see also id.* (noting that Dr. Overby "recommended a functional capacity evaluation (FCE) to determine the claimant's exertional and non-exertional limitations"). Finally, although ALJ Rippel "agree[d] with the limitation to 'occasionally' lift/carry 20 pounds," *id.*; *see* R. 17, he found that "both opinions nonetheless also appear[ed] to be based more on the subjective report of symptoms and limitations provided by the claimant, rather than on objective findings, and [were] excessive without balance, lessening the overall persuasiveness of the opinions accordingly," R. 22.

C.    *Analysis*

18

Taylor's arguments relate to the ALJ's RFC finding. A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week (or equivalent schedule) despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC itself should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015) (restrictions identified at step three). Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas*, 916 F.3d at 311–12. Conversely, a reviewing court that "cannot gauge the propriety of the ALJ's RFC assessment [generally]

cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson*

*v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662–63 (4th Cir. 2017).

*

Taylor challenges the ALJ's assessment of his subjective statements regarding his

symptoms. *See generally* Pl.'s Br. 22–28. Specifically, he contends that "the ALJ failed to

properly consider the reasonable relationship between [Taylor's] underlying medically

determinable impairment of Type I diabetes and the alleged symptoms and limitations, including

the need to frequently check [blood glucose ("BG")] and administer insulin and the

gastrointestinal symptoms of uncontrolled BG." *Id.* at 22. I agree.

The regulations set out a two-step process for evaluating a claimant's alleged symptoms.

*Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical

evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858

F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585,

594 (4th Cir. 1996). Step one is a "threshold" inquiry, at which the "'intensity, persistence, or

functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming

the claimant clears the first step, the ALJ moves on to step two. There, "the ALJ must evaluate

the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent

to which they limit his ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing

basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029,

at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the credibility of

[subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866,

after considering all the relevant evidence in the record, 20 C.F.R. § 404.1529(c).  The ALJ must

give specific reasons, supported by "references to the evidence," for the weight assigned to the

20

claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct.

21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court

will uphold the ALJ's credibility determination if his articulated rationale is legally adequate and

supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x

65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

ALJ Rippel did not satisfy this deferential standard. He satisfied step one by finding that

Taylor's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms." R. 19. He erred at step two, however, by failing to adequately explain his findings

regarding Taylor's testimony and the evidence of record, showing that Taylor would require

unpredictable or unscheduled breaks throughout the day for glucose monitoring, insulin

injections, and diarrhea resulting from his type I diabetes mellitus and diabetic gastroparesis. *See,

e.g.*, *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 389 (4th Cir. 2021) ("Obviously, the

need to visit the bathroom many times throughout the day impacts one's ability to work. And yet,

the ALJ did not analyze Appellant's need for regular bathroom breaks."); *cf. Richard P. v. Saul*,

No. 5:20cv22, 2021 WL 2152566, at *7–8 (W.D. Va. May 27, 2021) (ALJ's failure to evaluate

medical opinion regarding claimant's need to take multiple nebulizer treatments throughout the

day warranted reversal and remand).

In his initial Function Report, Taylor described difficulty controlling his diabetes, a

constant need to monitor his glucose levels and administer insulin shots, and his gastroparesis

further complicating his attempts to control his glucose levels. R. 237–38. He did not go out

alone often because of his unpredictable glucose spikes, R. 234, and he often had to "bail" on

plans because of erratic blood sugar levels, R. 237. In his second Function Report, Taylor

similarly stated that he would not go on long trips alone because of his need to monitor his

glucose levels. R. 276. Moreover, he reported "repeated severely high blood sugars" required him to alter his routine and said he had been making frequent trips to the restroom. R. 282. At the administrative hearing, Taylor described having to check his blood sugar every fifteen to twenty minutes, R. 82, said it was "not uncommon" for his glucose levels to exceed 300 three times a day, R. 83, and said he would often need to lay down or rest and drink water when a blood sugar spike occurred, R. 84. He also testified that he often experienced three to four episodes of diarrhea daily. R. 84–85.

This testimony appears relatively consistent with the evidence of record. For instance, Dr. Overby noted Taylor's constant glucose monitoring on several occasions throughout the relevant period. *See, e.g.*, R. 577 (Dr. Overby noting "continued variability" in Taylor's glucose levels "even though he may check his glucoses 10 to 12 times daily"); R. 583 (Dr. Overby noting "extreme variability" in Taylor's glucose readings "despite checking his glucoses 10 to 12 times a day and taking four to eight shots"); R. 584 (Dr. Overby stating Taylor "desperately needs to have an insulin pump and continuous glucose monitoring"); R. 1272 (Dr. Overby noting Taylor was "checking his glucoses 6 to 8 times daily and yet, he still has had some hypoglycemia."); R. 990 (Dr. Overby noting Taylor's complaints of "poorly controlled type 1 diabetes mellitus despite multiple injections and multiple glucose checks up to eight times daily"); R. 576 (Dr. Overby stating Taylor "would be an excellent candidate for continuous glucose monitoring" and instructing him to "record his glucose levels four times daily for at least a month"); *see also* R. 502 (Taylor telling PA Snyder that he quit work "due to gastroparesis and an inability to adequately manage blood sugars at work"); R. 511 (PA Snyder noting Taylor "continue[d] to struggle with gastroparesis, which [] made it more difficult to keep his sugars under control"). Indeed, Dr. Overby noted Taylor experienced a hypoglycemic episode during one appointment.

R. 990. Moreover, Taylor's provider consistently noted his uncontrolled blood sugar. *See, e.g.*, R. 579 ("Glucoses continue to be quite variable."); R. 990 (Taylor's glucoses were "extremely variable, often as high as 300"); R. 458 ("BS are vol[a]tile."). Taylor's testimony that he required frequent restroom breaks likewise finds support in the longitudinal record. *See, e.g.*, R. 575 (Taylor reporting he "frequently gets diarrhea"), R. 990 ("He still has intermittent diarrhea one to two times a day.").

Yet, despite Taylor's testimony regarding his need for unscheduled breaks and the evidence supporting that testimony, ALJ Rippel's RFC finding is devoid of any accommodation for Taylor's need for breaks to manage his severe medical impairments. Thus, the ALJ appears to have rejected this testimony. He does not, however, provide an accurate, logical explanation for that decision. ALJ Rippel started his RFC analysis by summarizing Taylor's subjective statements regarding his impairments, including observing that Taylor alleged "blood sugar spikes up to 300," which often required him to drink several glasses of water and/or lay down for up to a couple of hours. R. 18. He also acknowledged that Taylor "reported he went to the bathroom on a regular basis and suffered from diarrhea." *Id.* ALJ Rippel discredited this and much of Taylor's other testimony for several reasons. *Id. But see* R. 16 (citing the same evidence to support his finding that Taylor had "a moderate limitation" in his overall ability to adapt and manage himself). None of these reasons, however, undermine Taylor's testimony regarding his need for breaks because of his variable glucose levels and frequent diarrhea episodes. *See Woods*, 888 F.3d at 694 ("[T]he ALJ must *both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from that evidence to his conclusion."). As such, the ALJ did not offer an adequate explanation for why he rejected Taylor's testimony regarding his need for unscheduled breaks.

For instance, ALJ Rippel first relied on Taylor's treatment having been "routine, conservative, and unremarkable" as a reason for discrediting his subjective statements, noting "no surgery has been recommended, and he has been primarily treated with medications, which have been relatively effective in controlling his symptoms." R. 19. It is appropriate for an ALJ to consider the nature of a claimant's treatment when evaluating the reliability of his subjective reports. *See Dunn v. Colvin*, 607 F. App'x 264, 273 (4th Cir. 2015) ("[I]t is appropriate for the ALJ to consider the conservative nature of a plaintiff's treatment—among other factors—in judging the credibility of the plaintiff."). ALJ Rippel did not explain why daily medications, frequent glucose monitoring, and insulin injections constituted "unremarkable" or "conservative" treatment for allegedly disabling diabetes with gastroparesis. R. 19–20; *see* R. 576 (Dr. Overby noting that Taylor was "an excellent candidate" for an insulin infusion pump with monitor," which was "the last step in technology currently available"). Nor did he explain how he considered Taylor's and Dr. Overby's repeated, consistent reports that Taylor's symptoms were not controlled on various treatment regimens in finding that "medications" had been "relatively effective in controlling his symptoms." R. 19. Even if the record supported those two findings, however, they do not speak to Taylor's alleged need to take those treatments at unpredictable times throughout the workday.

Moreover, the ALJ cites only to evidence relating to Taylor's anxiety and ADHD medications in support of this assertion, *cf. Piper v. Colvin*, No. 2:15cv12555, 2016 WL 5109521, at *5 (S.D. W. Va. Sept. 20, 2016) ("[T]he ALJ's failure to consider medical evidence that appears to be most relevant to the assessment of Plaintiff's symptoms frustrates the Court's review."), which raises doubts as to whether this part of his analysis relates to Taylor's care of his diabetes and diabetic gastroparesis, R. 19–20 ("For instance, he reported during a March 4,

2020, therapy visit that Paxil was helping his anxiety, and during a March 4, 2020, physician

visit that Adderall was helping his ADHD."). As such, it is unclear, and the ALJ has not

explained, how or why Taylor's "conservative" treatment and positive responses to anxiety and

ADHD medication make his testimony regarding his need for constant glucose monitoring and

frequent restroom breaks less credible. *Widener v. Berryhill*, No. 7:17cv225, 2018 WL 847250,

at *5 (W.D. Va. Feb. 13, 2018) ("The court should not be left to speculate as to the reasons for

the administrative decision.").

    The next reason provided by the ALJ for discrediting Taylor's subjective statements

regarding his symptoms—that he "has not alleged any side effects from the use of

medications"—likewise fails to provide a logical basis for finding Taylor's testimony regarding

his need for breaks less than credible. R. 20. The side effects a claimant experiences from

medications are often a valid consideration when evaluating the claimant's subjective statements

regarding his symptoms. *See* SSR 16-3p, 2017 WL 5180304, at *7–8 (listing "[t]he type, dosage,

effectiveness, and side effects of any medication the individual takes or has taken" as relevant

considerations when evaluating a claimant's subjective reports of symptoms). Here, the ALJ's

analysis again focused on the medication Taylor took for asthma, ADHD, and other conditions

unrelated to diabetes or gastroparesis. R. 19–20. He did not mention Taylor's allegation that he

had "frequent diarrhea from gastroparesis and erythromycin, which is used to treat

gastroparesis." R. 276. Even if Taylor had not alleged side-effects from his medications,

however, it is not clear how that fact would undermine Taylor's testimony regarding his need for

frequent breaks to manage his diabetes and gastroparesis.

    Why Taylor's not having sought treatment from an endocrinology, neurology, pain

management, gastroenterology, cardiology, pulmonary, or mental health specialist, and not

having required "significant emergency room treatment or hospitalizations" casts doubt upon his testimony regarding his need for breaks is unclear from the ALJ's analysis. R. 20. The ALJ acknowledged Taylor was followed closely by his nephrologist for "diabetes with uncontrollable blood sugar levels," R. 19, and he did not cite any evidence suggesting that Taylor would be able to obtain better control over his erratic glucose levels or diarrhea episodes had he visited with one of these specialists. Rather, the suggested treatment was a continuous glucose monitoring system and insulin infusion, R. 579, 584, which the record demonstrates Taylor pursued, *see* R. 712, 990, although in June 2020 he was still working to get his insulin pump properly configured, R. 1304. Thus, the record shows that Taylor pursued the recommended treatment regarding his uncontrolled glucose levels and diarrhea from diabetic gastroparesis. Nonetheless, ALJ Rippel found that his failure to pursue other treatments reflected that these conditions were not as severe as Taylor alleged. Nothing in his decision, however, makes apparent his reasoning for making such a finding.

ALJ Rippel also did not explain why the lack of findings on imaging or exams provided a reasonable basis for discrediting Taylor's testimony regarding his need for breaks. R. 20. The need for continuous glucose monitoring and insulin administration, and frequent diarrhea bouts, would not be expected to be reflected on physical exam findings, *cf. Duncan v. Astrue*, No. 4:06cv230, 2008 WL 111158, at *6 (E.D.N.C. Jan. 8, 2008) ("[T]here are some conditions, such as migraine headaches, that cannot be diagnosed through laboratory or diagnostic testing."), and thus a lack of findings on physical exam would not necessarily reflect an absence of these conditions or a lesser degree of the severity of them. Although the lack of physical exam findings may reflect on Taylor's alleged exertional limitations, the ALJ did not explain why it was a valid basis for rejecting Taylor's testimony regarding his need for breaks because of his diabetic

gastroparesis. Moreover, one of the only forms of objective evidence related to these allegations—glucose and A1c levels—appear generally consistent with Taylor's allegations. *See, e.g.*, R. 585, 996, 997 (noting higher than normal glucose levels); R. 578, 586, 998 (noting higher than normal A1c levels). Although the ALJ cited Taylor's gastric emptying study, R. 20, which revealed normal results, R. 670, Dr. Overby nonetheless assessed gastroparesis, R. 990, and ALJ Rippel found it to be a "severe" impairment that significantly limited Taylor's ability to do basic work activities, R. 13. As such, the ALJ did not adequately explain why the lack of significant findings on imaging or physical exams casted doubt on Taylor's testimony regarding his need for breaks because of gastroparesis.

ALJ Rippel also found Taylor's inconsistent behavior and statements made his subjective allegations regarding his diabetes and gastroparesis symptoms less credible. R. 20. He first cited to Taylor's aspirational statement that he wanted to pursue a bachelor's degree in hopes of teaching English online, *see* R. 502, 426, and found this was inconsistent with his "allegations that his conditions affected his abilities to stand, see, memorize, concentrate, understand, follow instructions, and use his hands," R. 20. The ALJ also noted that during a face-to-face interview of unspecified duration with a DDS representative in February 2019, "there were no observed or perceived difficulties with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing," R. 20, 228–30. The ALJ did not explain how any of this evidence was inconsistent with Taylor's testimony regarding his need for constant glucose monitoring and frequent restroom breaks. As such, the ALJ again failed to provide a logical link between this evidence and his apparent finding that Taylor did not require more time off task than is allotted in a typical workday. *See Dowling* 986 F.3d at 389 ("Obviously, the need to visit the bathroom many times throughout the day impacts

one's ability to work. And yet, the ALJ did not analyze Appellant's need for regular bathroom breaks.").

The ALJ's reliance on Taylor's reported daily activities as a ground for rejecting his testimony regarding his need for breaks because of gastroparesis likewise does not withstand scrutiny. ALJ Rippel found Taylor's reported daily activities were inconsistent with the level of limitation alleged, noting that he reported in his April 2019 Function Report that he could "prepare light meals, clean dishes and the bathroom, vacuum, drive, shop in stores and by computer, count change, use a checkbook/money order, follow written and spoken instructions, go outside and go out alone, spend time with others, read, play guitar, and monitor his blood sugar and administer insulin shots." R. 20. The ALJ does not explain why these purported activities show that Taylor's testimony regarding his need for breaks less credible. *Cf. Brown*, 873 F.3d at 263 ("[T]he ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday."). Further, although Taylor testified that he could go outside and go out alone, he qualified that testimony, stating that he would not go out for long because of his unpredictable glucose levels, R. 234, and that he would need someone with him if he went on long trips so that he could monitor his blood sugars, R. 276; *see also Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them."). None of the other activities cited by the ALJ appear to have any rational relationship to Taylor's alleged need for breaks despite Taylor's consistent testimony regarding his need for constant glucose monitoring and frequent restroom breaks in both Function Reports and at the administrative hearing. *See, e.g.*, R. 237, 276, 282, 82–89. The ALJ needed to resolve this gap in logic and explain how Taylor's modest daily activities undermined

his testimony regarding the need for breaks. *See Woods*, 888 F.3d at 694. Yet, again, no such

explanation was offered. *Cf. Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 99 (4th Cir.

2020) ("[T]he ALJ failed to adequately explain how [his] limited ability to carry out daily

activities supported [her] conclusion that [he] could sustain an eight-hour workday.")*.*

Lastly, ALJ Rippel found Taylor's having not been "entirely compliant" with his

prescribed medications and treatment "suggest[ed] that the symptoms may not have been as

limiting as [Taylor] has alleged." R. 21. In support of this finding, he noted that Taylor was

prescribed Paroxetine and Erythromycin on October 10, 2018, *see* R. 578, but had not yet picked

these medications up on October 31, 2018, *see* R. 579. R. 21. This single isolated instance of a

short-time delay in picking up medications should have been considered in the context of the

remainder of the record, which shows that Taylor adhered to extremely demanding glucose

monitoring and insulin injection requirements. *Cf. Turk v. Berryhill*, No. 5:15cv73, 2017 WL

1184430, at *10 (W.D. Va. Mar. 29, 2017) ("Failure to follow treatment prescribed by a

physician without good reason can weigh against a claimant's credibility. Again, however, the

examples cited by the ALJ do not provide substantial evidence for his conclusion, and the record

contains numerous instances of Dr. Baird expressly stating that Turk had been compliant with

her recommended medications.") (internal citations omitted); *Judy T. v. Comm'r of Soc. Sec.*,

No. 4:18cv28, 2019 WL 4383140, at *10 (W.D. Va. July 25, 2019) ("[T]he fact that Judy

reported feeling well for a few weeks after restarting Pristiq does not support the ALJ's finding

that her symptoms 'stabilized' with medications."). Weighed against the many years of treatment

compliance, the ALJ's finding that a one time, two week delay in picking up a new medication

demonstrated noncompliance with treatment is not supported by substantial evidence. The ALJ

did cite to other evidence regarding Taylor's treatment compliance, including Taylor having said

that he was a "some day" marijuana user and his missing one mental health therapy appointment in October 2019 that ALJ Rippel appears to have found undermined Taylor's testimony regarding his symptoms. It is not apparent, however, that a single missed therapy appointment and marijuana use undermine the credibility of Taylor's reports of his need for frequent breaks.

ALJ Rippel needed to explain why, despite the considerable evidence in support of Taylor's allegations regarding his need for breaks, he discredited this testimony. An explanation is particularly important where, as here, the VE's testimony suggests that had the ALJ accepted Taylor's testimony in this regard, he would have found Taylor disabled. *See* R. 98–102. Accordingly, the ALJ's failure to build an "accurate and logical bridge" from the evidence to his conclusion that Taylor did not require an off-task or attendance limitation warrants remand. *Woods*, 888 F.3d at 694; *see also Lewis*, 858 F.3d at 870 ("[T]he ALJ failed to adequately explain the reasons for denying Lewis benefits given her extensive medical history, thus precluding our ability to undertake the 'meaningful review' with which we are tasked on appeal."); *Monroe*, 826 F.3d at 189 ("The ALJ cited evidence that he appeared to believe tended to discredit Monroe's testimony regarding his claimed episodes of loss of consciousness and fatigue. However, he failed to build an accurate and logical bridge from the evidence to his conclusion that Monroe's testimony was not credible.").

Taylor also asserts that the ALJ erred in his assessment of Dr. Overby's opinions. Pl.'s Br. 10–14. For claims filed after March 27, 2017, a "medical opinion" is a statement from a "medical source" about what a claimant can do despite his or her impairments and whether one or more impairments causes limitations or restrictions in his or her ability to perform physical, mental, and other work demands and to adapt to environmental conditions in the workplace. 20 C.F.R. § 404.1513(a)(2)(i)–(iv). The ALJ "will not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* § 404.1520c(a). Instead, the ALJ must adequately explain whether and to what extent every medical opinion in the record is persuasive. *See id.* § 404.1520c(b). The regulations instruct that supportability and consistency are "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. *See id.* § 404.1520c(b)(2), (c)(1)–(2). The ALJ may, but is generally not required to, explain how he or she considered other factors, including the medical source's specialization and relationship with the claimant. *Id.* § 404.1520c(c)(3)–(5).

ALJ Rippel summarized Dr. Overby's opinions, but determined they were "unpersuasive." R. 22. He explained that Dr. Overby's opinions were "not consistent" with the "entirely normal" examinations. *Id.* He also noted the opinions "were checkbox forms with minimal responses, and [Dr. Overby's] subsequent opinion was incomplete with no physical/postural, manipulative, or environmental restrictions." *Id.* The ALJ found that both opinions appeared based more on Taylor's subjective reports than on Dr. Overby's findings, but he agreed with Dr. Overby's finding that Taylor could lift/carry twenty pounds occasionally. *Id.*

The ALJ failed to offer a logical explanation regarding his conclusion as to the consistency of Dr. Overby's opinion. Dr. Overby indicated that Taylor would need five-minute breaks every twenty to thirty minutes, R. 1295, and would be off task more than 25% of the workday, R. 1297; *see also* R. 1010 (opining Taylor would be off-task 20% of the workday), because of symptoms caused by Taylor's diabetes and gastroparesis, R. 1294; *see also* R. 1010. Dr. Overby's treatment notes consistently documented Taylor's uncontrolled type I diabetes and diabetic gastroparesis, the efforts to treat those impairments, and objective evidence of Taylor's high blood sugar. *See, e.g.*, R. 585, 996, 997 (noting higher than normal glucose levels); R. 578,

586, 998 (noting higher than normal A1c levels); R. 579 ("Glucoses continue to be quite

variable."), R. 990 (Taylor's glucoses were "extremely variable, often as high as 300") R. 458

("BS are vol[a]tile."). Although the ALJ found that Dr. Overby's examination findings were

inconsistent with his opinions, the ALJ did not identify which findings were inconsistent with

Taylor's alleged need to take breaks or be off task. *See Roberta M. v. Saul*, No. 7:18cv243, 2019

WL 4786057, at *7 (W.D. Va. Sept. 30, 2019) ("In sum, the lack of reference to specific findings

by Dr. Lemmer and to specific parts of the records that are inconsistent with his findings,

frustrates meaningful review of the ALJ decision."). *Cf. Wiltz v. Barnhart*, 484 F. Supp. 2d 524,

532 (W.D. La. 2006) ("The ALJ's insistence upon objective medical evidence of Wiltz's

migraine headaches was error. Migraine headaches are particularly unsusceptible to diagnostic

testing."). Thus, the ALJ has failed to adequately explain, with references to the evidence, why

he found that Dr. Overby's opinions were "not consistent" with the other evidence of record.

Moreover, although ALJ Rippel determined that Dr. Overby's opinions were based

primarily on Taylor's subjective reports, he did not adequately explain how he reached this

conclusion either. *See Edwin M. v. Saul*, No. 4:19cv46, 2021 WL 1565415, at *10 (W.D. Va.

Apr. 21, 2021) ("An ALJ may discount a medical opinion that is based on a claimant's reported

symptoms rather than on the physician's medical findings. . . . But the ALJ did not explain what

evidence he relied on to make this determination."). As such, the ALJ failed to adequately

explain his conclusions regarding the persuasiveness of Dr. Overby's opinion. *Cf. Bratten v.

Astrue*, No. SAG-09-cv-1821, 2011 WL 260684, at *5 (D. Md. July 6, 2011) ("The ALJ did not

refer to any evidence that contradicted Dr. Fox's medical opinion and did not provide any facts

in support of his assertion that Dr. Fox had relied primarily on the Claimant's subjective

complaints. Such an assertion is purely speculative and is not an accurate characterization of the record.").

Furthermore, the ALJ did not explicitly discuss the "supportability" of Dr. Overby's opinions. 20 C.F.R. § 404.1520c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . ."). Although the ALJ did note that the opinions "were checkbox forms with minimal responses," *see Shiplett v. Colvin*, No. 5:15cv55, 2016 WL 6783270, at *12 (W.D. Va. Nov. 16, 2016) ("The fact that Dr. Pollard checked off boxes with his objective findings in a functional assessment does not by itself provide grounds to discount his opinion where his treatment notes support that assessment."), the regulations require a more fulsome discussion of a medical opinion's "supportability." 20 C.F.R. § 1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her opinion(s) . . . , the more persuasive the medical opinion(s) . . . will be.").

Accordingly, I cannot find that the ALJ's assessment of Dr. Overby's opinion is supported by substantial evidence.

IV. Conclusion

I take no position on whether Taylor is entitled to disability benefits. On remand, the ALJ must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Taylor cannot prove disability at step three, provide an accurate, logical link between the evidence the ALJ found credible and the RFC determination.

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Taylor's Motion for Summary Judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 7, 2022

Joel C. Hoppe
United States Magistrate Judge

34